# SUMMONS - CIVIL

JD-CV-1 Rev. 10-15
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a,
52-48, 52-259, P.B. §§ 3-1 through 3-21, 8-1, 10-13

**STATE OF CONNECTICUT**
## SUPERIOR COURT
www.jud.ct.gov



**See other side for instructions**

☐ "X" if amount, legal interest or property in demand, not including interest and costs is less than $2,500.
☐ "X" if amount, legal interest or property in demand, not including interest and costs is $2,500 or more.
☒ "X" if claiming other relief in addition to or in lieu of money or damages.

TO: Any proper officer; BY AUTHORITY OF THE STATE OF CONNECTICUT, you are hereby commanded to make due and legal service of this Summons and attached Complaint.

| Address of court clerk where writ and other papers shall be filed *(Number, street, town and zip code)* (C.G.S. §§ 51-346, 51-350) | Telephone number of clerk *(with area code)* | Return Date *(Must be a Tuesday)* |
|---|---|---|
| 95 Washington Street, Hartford, CT 06106 | ( 860 )548-2700 | Dec  29  2015 <br> Month  Day  Year |

| ☒ Judicial District | ☐ G.A. Number: | At *(Town in which writ is returnable)* (C.G.S. §§ 51-346, 51-349) | Case type code *(See list on page 2)* |
|---|---|---|---|
| ☐ Housing Session | | Hartford | Major: **M**   Minor: **90** |

**For the Plaintiff(s) please enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented *(Number, street, town and zip code)* | Juris number *(to be entered by attorney only)* |
|---|---|
| Marisa Halm, Center for Children's Advocacy, 65 Elizabeth St., Hartford, CT 06105 | 421708 |

| Telephone number *(with area code)* | Signature of Plaintiff *(if self-represented)* | |
|---|---|---|
| ( 860 ) 570-5327 | | |

| The attorney or law firm appearing for the plaintiff, or the plaintiff if self-represented, agrees to accept papers (service) electronically in this case under Section 10-13 of the Connecticut Practice Book. | ☒ Yes  ☐ No | Email address for delivery of papers under Section 10-13 *(if agreed to)* <br> mhalm@kidscounsel.org |
|---|---|---|

| Number of Plaintiffs: **4** | Number of Defendants: **11** | ☒ Form JD-CV-2 attached for additional parties |
|---|---|---|

| Parties | Name *(Last, First, Middle Initial)* and Address of Each party *(Number; Street; P.O. Box; Town; State; Zip; Country, if not USA)* | |
|---|---|---|
| **First Plaintiff** | Name: Alicia B., through her parent and next friend, Cynthia B. <br> Address: Center for Children's Advocacy 65 Elizabeth St, Hartford, CT 06105 | P-01 |
| **Additional Plaintiff** | Name: Cynthia B. <br> Address: | P-02 |
| **First Defendant** | Name: Dannel Malloy, Governor, State of Conn. <br> Address: State Capitol, Room 200, Hartford, CT  06106 | D-01 |
| **Additional Defendant** | Name: Dianna Wentzell, Commissioner, State Dept. of Education <br> Address: 165 Capitol Avenue, Room 305, Hartford, CT  06106 | D-02 |
| **Additional Defendant** | Name: State Department of Education <br> Address: 165 Capitol Avenue, Room 305, Hartford, CT  06106 | D-03 |
| **Additional Defendant** | Name: Allan B. Taylor, Chairperson, State Board of Ed. <br> Address: 165 Capitol Avenue, Room 301, Hartford, CT  06106 | D-04 |

## Notice to Each Defendant

1. **YOU ARE BEING SUED.** This paper is a Summons in a lawsuit. The complaint attached to these papers states the claims that each plaintiff is making against you in this lawsuit.
2. To be notified of further proceedings, you or your attorney must file a form called an "Appearance" with the clerk of the above-named Court at the above Court address on or before the second day after the above Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to come to court.
3. If you or your attorney do not file a written "Appearance" form on time, a judgment may be entered against you by default. The "Appearance" form may be obtained at the Court address above or at www.jud.ct.gov under "Court Forms."
4. If you believe that you have insurance that may cover the claim that is being made against you in this lawsuit, you should immediately contact your insurance representative. Other action you may have to take is described in the Connecticut Practice Book which may be found in a superior court law library or on-line at www.jud.ct.gov under "Court Rules."
5. If you have questions about the Summons and Complaint, you should talk to an attorney quickly. **The Clerk of Court is not allowed to give advice on legal questions.**

| Signed *(Sign and "X" proper box)* | ☒ Commissioner of the Superior Court <br> ☐ Assistant Clerk | Name of Person Signing at Left <br> **Marisa Halm** | Date signed <br> 12/15/2015 |
|---|---|---|---|

| If this Summons is signed by a Clerk: | | For Court Use Only |
|---|---|---|
| a. The signing has been done so that the Plaintiff(s) will not be denied access to the courts. <br> b. It is the responsibility of the Plaintiff(s) to see that service is made in the manner provided by law. <br> c. The Clerk is not permitted to give any legal advice in connection with any lawsuit. <br> d. The Clerk signing this Summons at the request of the Plaintiff(s) is not responsible in any way for any errors or omissions in the Summons, any allegations contained in the Complaint, or the service of the Summons or Complaint. | File Date | **FILED** <br> DEC 1 6 2015 <br> **HARTFORD J.D.** |

| I certify I have read and understand the above: | Signed *(Self-Represented Plaintiff)* | Date | Docket Number <br> CV15-504 0967 |
|---|---|---|---|

CV15- 5040967

RETURN DATE:        DECEMBER 29, 2015

|  |  |  |
|---|---|---|
| | : | |
| ALICIA B., PPA | : | |
| Through her Parent and Next Friend, | : | |
| CYNTHIA B., | : | |
| TOBIAS J., PPA | : | |
| Through his Parent and Next Friend, | : | |
| ROBERT J. | : | |
| | : | |
| PLAINTIFFS | : | SUPERIOR COURT |
| | : | |
| v. | : | JUDICIAL DISTRICT OF |
| | : | HARTFORD |
| | : | |
| DANNEL MALLOY, in his Official | : | |
| Capacity as Governor of the State of | : | |
| Connecticut, DIANNA WENTZELL, in her | : | |
| Official Capacity as Commissioner of the | : | |
| State Dept. Of Education, STATE | : | |
| DEPARTMENT OF EDUCATION, | : | |
| ALLAN B. TAYLOR in his | : | |
| Official Capacity as Chairperson of the | : | |
| State Board Of Education, STATE BOARD | : | |
| OF EDUCATION, BETH SCHIAVINO- | : | |
| NARVAEZ, in her Official Capacity as | : | |
| Superintendent of Hartford Board Of | : | |
| Education, HARTFORD BOARD | : | |
| OF EDUCATION, MATTHEW GEARY | : | |
| in his Official Capacity as Superintendent of | : | |
| Manchester Board Of Education, | : | |
| MANCHESTER BOARD OF | : | |
| EDUCATION, JAMES THOMPSON, JR., | : | |
| in his Official Capacity as Superintendent of | : | |
| Bloomfield Board Of Education, and | : | |
| BLOOMFIELD BOARD OF | : | |
| EDUCATION, | : | |
| | : | |
| DEFENDANTS | : | December 15, 2015 |

<u>COMPLAINT</u>

1.      This Complaint is brought by and on behalf of Connecticut children who have been expelled and excluded from school to enforce the children's fundamental right to an education guaranteed by the Constitution of the State of Connecticut (the "Constitution") and their fundamental right to equal protection under the laws, as set forth in both the State Constitution and the Equal Protection Clause of the Constitution of the United States of America.  This Complaint is further brought by and on behalf of the parents of these expelled children.

2.      The right to an education is a fundamental right in the State of Connecticut pursuant to Article Eighth, § 1 of the Constitution, which the State and its actors are required to guarantee and which must be directly provided by the local school district in which a child resides.  It is a right over which these children may assert a property interest and a right to which all children should have equal access.

3.      Expelled children, however, are given substandard education and are relegated to inadequate education settings during the course of their expulsion.  This substandard experience causes expelled children to fall behind their peers, interferes with their ability to graduate, and most importantly, fails to provide them with the skills and knowledge they are entitled to obtain as students receiving a public education in the State of Connecticut.

4.      Although expelled children are entitled to adequate education, the alternative educational opportunities available to expelled students do not satisfy this Constitutional guarantee.  Compounding these violations, Black children are disproportionally expelled in Connecticut as a result of selective enforcement of facially

neutral disciplinary policies and, consequently, are disproportionally deprived of the fundamental right to education.

5.      The State of Connecticut, through the Defendants listed herein, has failed to guarantee the right of education for these children.  By consistently failing to provide guidance, oversight, and clear standards concerning the administration of the educational programs provided to expelled children, the State denied and continues to deny these children their right to an education, and prevents equal access to the meaningful educational experience to which they are entitled under the State and federal Constitutions.

6.      In Connecticut, Black students are more likely to be expelled than White students, and when they are, they receive inadequate education.  This creates a hostile education environment, an environment devoid of learning.  This hostile education environment adversely affects Black children's ability to obtain the same benefit from schooling as White students.  The specific environment faced by Plaintiffs in this action was particularly hostile to adequate education.

7.      State actors know that these children suffer from a hostile education environment and know that Black children are disproportionately affected by these harmful policies.  The State and its representatives are deliberately indifferent to this suffering and have consistently failed to ensure that these children have equal access to adequate education.

8.      Hartford Public Schools, Manchester Public Schools, and Bloomfield Public Schools expel students and then provide them with unacceptable, substandard alternative educational opportunities.  These school districts provide students with little-

to-no direct instruction in core academic subjects for less than three hours per day, limited-to-no structure, and no access to educational programming in non-academic subjects such as physical education, health, music, art or vocational electives, all of which are essential components of a meaningful education in accordance with Connecticut's standards. By doing so, these districts deny expelled children access to the meaningful educational opportunity to which the Constitution entitles them.

9.      These districts continue to be deliberately indifferent to the hostile education environment that Black children in their respective districts endure while expelled. Despite being aware of the inadequate educational opportunities offered to expelled students—and specifically to Black expelled students—district officials have not taken any action to remedy the fact that Black expelled children are consistently placed in educational environments where learning is stunted.

10.     In so doing, the State and its districts have violated the Connecticut Constitution's Article Eighth, § 1 and Article First, §§ 1 and 20. They have also violated Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the United States Constitution. The individual State and municipal actors responsible for the deprivation of these rights have additionally violated 42 U.S.C. § 1983.

I.      THE PARTIES

A.      THE PLAINTIFFS

11.     Plaintiff Alicia B. is a thirteen-year-old Black student who is entitled to receive a public education in the State of Connecticut. She lives in Hartford, Connecticut, with her mother, Cynthia B., who brings this Complaint as her parent and next friend.

12.     During the 2013-2014 school year, Alicia B. was a sixth grade student at SAND School ("SAND") in Hartford.  On March 27, 2014, Alicia B. was involved in an altercation at school, and SAND issued her a ten-day suspension pending expulsion.

13.     On April 17, 2014, an expulsion hearing was conducted and a hearing officer appointed by the Hartford Board of Education ordered Alicia B. expelled for 180 days.

14.     During Alicia B.'s expulsion, the Hartford Board of Education assigned her to the New Visions program, where she was provided an education for less than three hours a day.

15.     Plaintiff Tobias J. is a fifteen-year-old Black student who is entitled to receive a public education in the State of Connecticut.  He is a former resident of Manchester, Connecticut and currently resides in Hartford, Connecticut, with his father, Robert J., who brings this Complaint as his parent and next friend.

16.     During his seventh and eighth grade years (the 2012-2013 and 2013-2014 school years, respectively), while a Manchester resident, Tobias J. attended the Global Experience Magnet School in Bloomfield, Connecticut, through the Choice Program.

17.     On January 14, 2014, while Tobias J. was in the eighth grade, he was expelled from the Global Experience Magnet School after his out-of-school arrest was reported to the school.  Even though the allegation underlying the arrest was not substantiated, Bloomfield Public Schools expelled Tobias J. through December 16, 2014.

18.     The expulsion hearing decision from Bloomfield Public Schools identified Manchester Public Schools as responsible for providing Tobias J. with an

5

alternative educational opportunity during his expulsion.  Manchester Board of Education

provided Tobias J. with an alternative education for approximately two hours a day

through the beginning of April 2014.  After that date, Tobias J. received no alternative

educational opportunity.

B.    THE DEFENDANTS

19.      Defendant Dannel Malloy ("Malloy"), or his successor, is the Governor

of the State of Connecticut.  Under Article Fourth, § 12 of the State Constitution, he is

responsible for ensuring all State laws are executed.  Under Conn. Gen. Stat. § 3-1, he is

authorized to investigate and take proper action concerning any matter involving the

enforcement of the laws of the State and the protection of its citizens.  Under Conn. Gen.

Stat. § 10-1, 10-2 and 10-3a, he is also responsible for appointing the members of the

State Board Of Education and appointing a Commissioner of Education who shall serve

as the head of the State Department Of Education.  Defendant Malloy is further

responsible, under Conn. Gen. Stat. § 10-4, for receiving a detailed statement of the

activities of the State Board Of Education and a summary of the conditions of

Connecticut public schools and of the amount and quality of instruction within those

public schools.

20.      Defendant State Board Of Education ("State Board"), under Conn. Gen.

Stat. § 10-4, is charged with the oversight, supervision and control of the educational

interests of the State including the educational interests of all students.  The State Board

is responsible for ensuring compliance with and implementation of the laws concerning

education under the Constitution. Furthermore, under Conn. Gen. Stat. § 10-3a, the State

Board is responsible for recommending to Defendant Malloy a Commissioner of

Education and also overseeing the organization of State Department Of Education, which the Commissioner is designated to administer.

21.     Defendant Allan B. Taylor ("Taylor"), or his successor, is Chairman of the State Board.  He leads the State Board's oversight, supervision, and control of the State's educational interests as defined in Conn. Gen. Stat. § 10-4a.

22.     Defendant State Department Of Education ("SDE"), pursuant to Conn. Gen. Stat. § 10-3a, acts as the administrative arm of the State Board to employ the educational policies and recommendations of the State Board.  SDE, under the direction of the State Board, is responsible for overseeing the actions of individual school districts and providing them with appropriate guidance to ensure that all Connecticut students receive an adequate education.

23.     Defendant Commissioner Dianna Wentzell ("Wentzell"), or her successor, pursuant to Conn. Gen. Stat. §§ 10-2, 10-3a, serves as the administrative head of SDE and is responsible for carrying out the mandates of the State Board.

24.     In this Complaint, the term "State Defendants" shall be used to mean Defendants Malloy, Taylor, Wentzell, the State Board, and SDE.

25.     Defendant Hartford Board Of Education ("HBOE" or "Hartford Public Schools"), Defendant Manchester Board Of Education ("MBOE" or "Manchester Public Schools"), and Defendant Bloomfield Board Of Education ("BBOE" or "Bloomfield Public Schools"), pursuant to Conn. Gen. Stat. §§ 10-15 and 10-220, are responsible for providing an education to the students enrolled in each of their school districts, ensuring that this education meets a minimal qualitative standard, and complying with all

education laws, including Conn. Gen. Stat. § 10-233d, which requires an alternative educational opportunity for qualified expelled students.

26.     Defendant Beth Schiavino-Narvaez ("Narvaez"), or her successor, is the Superintendent of Hartford Public Schools and an employee of HBOE, and is responsible for the oversight, administration, and implementation of education in all of the schools and programs within Hartford Public Schools, including the alternative educational opportunities provided to expelled students.

27.     In this Complaint, the term "Hartford Defendants" shall be used to mean Defendants HBOE and Narvaez.

28.     Defendant Matthew Geary ("Geary"), or his successor, is the Superintendent of Manchester Public Schools and an employee of MBOE, and is responsible for the oversight, administration, and implementation of education in all of the schools and programs within Manchester Public Schools, including the alternative educational opportunities provided to expelled students.

29.     In this Complaint, the term "Manchester Defendants" shall be used to include Defendants MBOE and Geary.

30.     Defendant James Thompson Jr. ("Thompson"), or his successor, is the Superintendent of Bloomfield Public Schools and an employee of BBOE, and is responsible for the oversight, administration, and implementation of education in all of the schools and programs within Bloomfield Public Schools, including the alternative educational opportunities provided to expelled students.

31.     In this Complaint, the term "Bloomfield Defendants" shall be used to include Defendants BBOE and Thompson.

32.     All of the individual Defendants and/or their successors are being sued in their official capacities.

## II.     STATEMENT OF FACTS

### A.     PLAINTIFFS WERE HARMED BY THE INADEQUATE EDUCATION THEY HAVE RECEIVED DURING THEIR EXPULSIONS

#### i.     Plaintiff Alicia B. Has Been Harmed By the Lack Of Education She Received During Her Expulsion

33.     During the 2013-2014 school year, Alicia B. was a sixth grade student at SAND in Hartford.

34.     On or about March 27, 2014, Alicia B. was involved in a fight at school.

35.     As a result of this incident, Alicia B. was expelled on April 17, 2014 for a period of 180 days by the hearing officer appointed by the Hartford Board of Education. Neither Alicia B. nor her mother Cynthia B. were present for this hearing because they did not receive notice of it.  Alicia B.'s expulsion was not mandatory under Conn. Gen. Stat. § 10-233d.

36.     Cynthia B. and Alicia B. requested that the hearing be reopened.  Even though the hearing officer agreed to reopen the hearing, Hartford Public Schools staff told Cynthia B. that Alicia B. must attend New Visions, the alternative program offered by the HBOE, while the hearing was pending.  Cynthia B. was worried about the influence of other New Visions students on Alicia B. and did not immediately enroll Alicia B. as she was seeking other alternative educational options.

37.     The expulsion hearing was re-heard by the same hearing officer on June 25, 2014.  Shortly thereafter, the hearing officer affirmed the previous decision expelling Alicia B. for 180 days.

38.     The HBOE informed Cynthia B. that the New Visions alternate school

program was the only alternative educational option available to Alicia B, and thus,

Cynthia B. enrolled Alicia B. at New Visions at the start of the 2014-2015 school year.

39.     Alicia B. had to travel across town, by herself on the city bus, to get to

New Visions because transportation was not provided.  Cynthia B. was extremely

worried about Alicia B. traveling on the bus alone.

40.     Alicia B. was assigned to a morning session at New Visions, which was

just under three hours in duration.  At this time, Alicia B. was advised by New Visions

staff that she was going to be a seventh grade student.  However, she was never provided

any make-up work or remedial instruction from the date of the initial expulsion decision.

41.     Alicia B. was placed in an environment that failed to prioritize her

academic progress or take into account the severe consequences that lack of education

school can have on a child's learning.

42.     Although New Visions had its own small group of staff and teachers, the

academic work assigned to expelled students is not intended to be prepared by New

Visions staff.  Instead, the work is supposed to be prepared and sent by the teachers at the

individual students' home schools.

43.     For approximately the first two months at New Visions, Alicia B. did not

receive any work from her teachers at her home school of SAND.  Instead, the staff at

New Visions gave Alicia B. packets of work unrelated to any SAND curriculum.  The

majority of work that she was given was very easy for Alicia B., and she learned nothing

new from it.  One of the New Visions teaching assistants even told Alicia B. that the

work they were giving her did not matter.

44.    Cynthia B. repeatedly visited SAND and spoke with the principal, vice principal and various support staff to ask them to ensure that appropriate work be sent to New Visions for Alicia B.

45.    Finally, more than two months after Alicia B. had enrolled at New Visions, SAND began to send coursework.  However, SAND inconsistently provided Alicia B.'s work to New Visions, forcing Cynthia B. to visit SAND regularly to ensure Alicia B. would receive appropriate coursework.  Moreover, even after SAND began sending work to New Visions, SAND did not provide work in all subjects.  Alicia B. received some English, math, and science work from SAND, but she never received any work in history or in any of her electives including physical education, health, art, or music.  Although she should have been receiving instruction in history and these electives, these courses simply were not available to Alicia B at New Visions.

46.    When Alicia B. began at New Visions, she was initially in one classroom, with the same teacher the entire time.  After she had been attending New Visions for a few months, the class format at New Visions changed and Alicia B. went from sitting in one class the entire time she was there to two different class blocks, the first of which focused on English and the second of which focused on math.  Each class met for less than 90 minutes.  Each class had one lead teacher.  Depending on the day and/or the class, some classes also had an uncertified teaching aide.

47.    There were no other academic classes at New Visions.

48.    In both English and math classes, students worked independently on work that was sent to them by their home school without receiving any lessons or direct

11

instruction from the teacher or aide.  The teacher or aide would provide students one-on-one help if a student asked for it.  Otherwise, all students worked independently.

49.     Alicia B. rarely asked the New Visions teacher or aide for help because the work she received from SAND was very easy.  In contrast, Alicia B. asked for help when she was at SAND.  At SAND, the coursework challenged Alicia B. and she sought help from teachers to complete her work.  The work Alicia B. received at New Visions was much less rigorous than what she received at SAND.

50.     The lack of rigor in New Visions was evident in Alicia B.'s English class.  SAND provided Alicia B. a Reading and Writing workbook called Expert 21 for her time at New Visions.  However, SAND did not provide Alicia B. with all the work that her peers at SAND received and New Visions did not provide Alicia B. a teacher who kept her on pace with the SAND English curriculum.  When Alicia B. returned to SAND, she learned that she was academically behind the other students in English.

51.     Alicia B. did not have access to adequate instruction, computer technology, materials, or tools for learning while at New Visions.  New Visions only provided worksheets in a few classes, which Alicia B. had to complete independently.  At SAND, Alicia B. had access to well-rounded learning opportunities, and she regularly played the flute in music and played basketball in physical education.  These materials and opportunities were not part of the education offered at New Visions.

52.     Alicia B. was greatly discouraged by the education she received at New Visions because it seemed that no one cared about her education.  For two months, SAND did not provide her any work despite Cynthia B.'s efforts to ensure Alicia B. received appropriate work.  During that time, New Visions staff distributed packets of

work to Alicia B. and expressly acknowledged that the work was irrelevant and that it did not matter whether or not she completed the assignments. Alicia B. felt there was no point to education when the education she received was so poor and meaningless.

53.     Furthermore, even after SAND began to send her work, Alicia B. never received any feedback, progress reports, report cards, grades or acknowledgement of the work that she did complete from SAND while she was at New Visions. It was as if the work she had completed was for nothing at all.

54.     Given these realities, Alicia B. came to believe there was no point to the education she was receiving at New Visions and that her education was completely meaningless. As a result, this made her experience at New Visions, and the majority of her seventh grade year, debilitating and stressful for her. Alicia B. considered dropping out of school as a result of her experience at New Visions.

55.     Cynthia B. felt that New Visions harmed Alicia B. by failing to provide her with education at a time when she particularly needed it.

56.     Additionally, Alicia B.'s time at New Visions was a great source of stress and anxiety for Cynthia B. She spent hours going back and forth with SAND and New Visions staff, attempting to make sure that Alicia B. received some sort of education. This created undue anxiety and stress for Cynthia B.

57.     During the period of her expulsion, Alicia B. was placed in a hostile educational environment where she had limited access to learning and the necessities of a well-rounded public education.

58.     This hostile educational environment was not unique. Instead, it illustrates the inadequate education forced upon expelled Black children throughout the state.

59.     During the current 2015-2016 school year, Alicia B. is an eighth grade student at SAND. Due to an incident which occurred on October 27, 2015, SAND again moved to expel Alicia B. A hearing for this incident was held on December 2, 2015 in front of the same hearing officer who expelled Alicia B. in 2014. As of December 14, 2015, an expulsion decision had not been issued.

60.     If Alicia B. is expelled from SAND, she expects that she will once again be offered alternative education through New Visions. Alicia B. is currently enrolled in nine classes at SAND: reading, music, physical education, art, science, social studies, language arts, mathematics, and health. New Visions offers two academic classes. Additionally, SAND may once again delay sending relevant work for Alicia B., who may once again complete pointless packets from New Visions staff. Moreover, even if Alicia B. does receive work from SAND, she has no expectation that she will receive any credit or assessment for this work, given that she received no progress reports, grades or report cards for her previous work at New Visions.

61.     Not only does New Visions fail to provide adequate education, it also harms Alicia B.'s chance at pursuing educational opportunities at the end of the expulsion period. Alicia B. is currently waitlisted for several magnet schools, and she is enthusiastic about attending a magnet school. However, if expelled for 180 days, this would extend into Alicia B.'s ninth grade year and Alicia B. fears it would preclude her from securing a seat at a magnet school at the start of the year.

62.     Given her previous experience at New Visions, Alicia B. would rather drop out of school than return to New Visions. Though Alicia B. prides herself on being

a smart student, the poor education at New Visions deeply discouraged her and made her feel hopeless about her future.

### ii.   Plaintiff Tobias J. Has Been Harmed By the Lack Of Education He Received During His Period of Expulsion and Subsequent Exclusion

63.   During the 2013-2014 school year, Tobias J. was an eighth grade student at the Global Experience Magnet School in Bloomfield, Connecticut.

64.   In October 2013, Tobias J. was accused by his younger sister of a delinquent act outside of school.  There were no other witnesses to this alleged act. Manchester Police were notified of this accusation.  In December 2013, the Manchester Police arrested Tobias J. based upon this accusation.  The Connecticut Department Of Children And Families found the accusation to be unsubstantiated.  In March 2015, a *nolle prosequi* was entered for Tobias J.'s delinquency charges related to this accusation, reflecting the prosecutor's decision to drop the charges.

65.   On December 16, 2013, the Manchester Police notified Bloomfield Public Schools and the Global Experience Magnet School of this arrest.  Upon receiving this information, the Bloomfield Public Schools decided to suspend Tobias J. and pursue expulsion proceedings against him.

66.   An expulsion hearing occurred for Tobias J. in Bloomfield on January 13, 2014.  Tobias J. was not present; his mother was present on his behalf.

67.   As a result of this expulsion hearing and a hearing decision dated January 14, 2014, Tobias J. was expelled from school through December 16, 2014.  His expulsion was not mandatory under Conn. Gen. Stat. § 10-233d.

68.   During his period of expulsion, Tobias J. was entitled to an alternative educational opportunity under Conn. Gen. Stat. § 10-233d.  The Bloomfield Public

Schools hearing officer who expelled Tobias J. did not, however, describe the details of
the required alternative educational opportunity. Rather, the Bloomfield Public Schools
hearing decision only indicated that Manchester Public Schools was responsible for
providing the alternative educational opportunity.

69.     On or about January 21, 2014, Bloomfield Public Schools notified
Manchester Public Schools of Tobias J.'s expulsion.

70.     In accordance with Conn. Gen. Stat. § 10-233d(g), Tobias J. was entitled
to another hearing to determine if this expulsion hearing was to be adopted by
Manchester Public Schools. Tobias J. never received notice of any such hearing and no
such hearing is documented in his educational record. Upon information and belief,
Manchester Public Schools automatically adopted Bloomfield Public Schools' expulsion
decision.

71.     On or about January 25, 2014, Tobias J. and his family were contacted
by Manchester Public Schools staff about Tobias J.'s alternative educational opportunity.
Manchester Public Schools staff told the family that this alternative educational
opportunity would be provided through individual tutoring. The individual tutoring
started shortly thereafter.

72.     Tobias J. was assigned to Mr. Michael Powell ("Mr. Powell"), a
Manchester Public Schools regular education middle school English teacher, as his tutor.

73.     Mr. Powell met with Tobias J. approximately five days a week for two
hours a day. Tobias J. and Mr. Powell met at the Wilson-Gray YMCA Youth and Family
Center ("YMCA") in the evenings, usually from six to eight PM. Approximately once a

month, Mr. Powell was unable to attend the tutoring session and Tobias J. would work individually.

74.     Most nights, Mr. Powell met Tobias J. in a library area of the YMCA. Tobias J. found that it could be difficult to focus on his work in the library area because of intermittent distractions, such as other students playing music out loud.

75.     Tobias J. primarily received work in only four courses: math, history, Spanish, and English.  He received minimal work in science, a subject that has always been difficult for Tobias J., and no other work in any other subjects.  Tobias J. only started receiving science work after asking the tutor about it, but after receiving very little science work, he became discouraged and stopped asking the tutor about it.

76.     Although Tobias J. had been taking art and music at the Global Experience Magnet School, he received no access to these courses during his period of tutoring.

77.     Tobias J. received minimal direct instruction from his tutor in English, math, and history.  This direct instruction consisted of reading through copies of textbooks together and reviewing worksheets together.  Tobias J. received no direct instruction in Spanish.

78.     Tobias J. did not have the benefit of learning from classroom discussion, discussions with his peers, or of asking questions to a teacher certified in the subject area. Tobias J. had no access to peer editing or other peer learning opportunities he had at Global Experience Magnet School, such as dramatic readings of literature.

79.     During tutoring, Tobias J. had access to a computer and a calculator. However, Tobias J. had no access to other technology or supplies that he had used in his

classrooms at Global Experience Magnet School. During tutoring, he had no access to laboratory facilities for science class, equipment for musical instruction, supplies for art instruction, or activities like science fairs.

80. Despite having attended tutoring regularly, Tobias J. never received any kind of report card or progress report detailing the work that he did with his tutor. It was as if he had received no education at all.

81. After a period of less than three months, on or about April 1, 2014, Manchester Public Schools abruptly ceased Tobias J.'s tutoring. Mr. Powell told Tobias J. that the tutoring had been discontinued. Mr. Powell reported to Tobias J. that Manchester Public Schools told him that Tobias J. should be a Hartford Public Schools student and could consequently no longer receive tutoring from Manchester Public Schools.

82. Upon information and belief, because Tobias J. was temporarily living with his paternal grandmother in Hartford, Manchester Public Schools refused to provide him with access to an alternative educational opportunity. Given Tobias J.'s temporary living situation, however, Tobias J. should have remained eligible for educational services from Manchester Public Schools under the McKinney-Vento Homeless Assistance Act, 42 U.S.C. § 11431 *et seq*.

83. Due to Manchester Public Schools' refusal to provide Tobias J. with tutoring, Tobias J. went without any education at all for the rest of the 2013-2014 school year, the balance of what should have been his eighth grade year. Tobias J. and Robert J. were not aware that he had any right to an education during his expulsion. They knew that his expulsion was in effect until December 2014, and they assumed that the school

district would have provided him with an education if it was required under the law. Consequently, they did not challenge Manchester Public Schools' refusal to provide Tobias J. with an education.

84.     In Spring 2014, Tobias J. spoke to his seventh grade French teacher from Global Experience Magnet School, Mr. Moussa Ly ("Mr. Ly"). Mr. Ly told Tobias J. that he would talk to the Global Experience Magnet School principal to find out whether Tobias could return to Global Experience Magnet School before the end of his expulsion. Tobias J. knew that other students had been allowed to return to school before their expulsions were over; however, he did not understand the process for achieving an early return to school. Tobias J. never heard back from Mr. Ly so he assumed that he was not able to return to school early.

85.     In late May or early June 2014, Tobias J. moved in permanently with his father in Hartford. Given his lack of knowledge about Tobias J.'s rights as an expelled student, Robert J. had the mistaken impression that Tobias J. had to wait until his expulsion was over to receive any education from Hartford Public Schools.

86.     At the start of the 2014-2015 school year, although Tobias J. was entitled to receive an alternative educational opportunity, he was receiving no education. Tobias J. and Robert J. still had the mistaken impression that Tobias J. was not entitled to receive any education whatsoever.

87.     On or about November 9, 2014, Robert J. took Tobias J. to register and enroll in Hartford Public Schools, in preparation for the end of his expulsion. At this time, staff at the Hartford Public Schools Welcome Center ("Welcome Center") told him that there was space for Tobias J. at Milner School ("Milner") in the eighth grade.

Welcome Center staff told Robert J. that he would need to bring paperwork to Milner to complete Tobias J.'s enrollment.

88.　　Tobias J. was angry when he heard that Hartford Public Schools was going to require him to attend eighth grade again because he should have been in ninth grade during the 2014-2015 school year.

89.　　On or about November 9, 2014, Robert J. brought the registration and enrollment paperwork to Milner.  The Milner secretary told him to bring Tobias J. back the next day.

90.　　On or about November 10, 2014, Robert J. and Tobias J. went to Milner to try to finish the registration and enrollment process.  Robert J. told the Milner secretary that Tobias J. had been expelled the previous school year.  The Milner secretary told Robert J. that he would need to talk to the Milner principal, Karen Lott ("Ms. Lott").  Ms. Lott spoke with Robert J. and told him that Tobias J. would likely need to undergo some sort of assessment before he could attend Milner.  She also told Robert J. that she would need to check with her supervisor at HBOE Central Office to confirm that Tobias J. was entitled to attend school.  As a result, Tobias J.'s enrollment process was cut short.  Ms. Lott told Robert J. that he should wait to hear back from her before Tobias J. could finish enrolling and begin to receive education again.

91.　　The actions by Hartford Public Schools and Milner staff denied Tobias J. an education to which he was entitled and confirmed his and his father's mistaken belief that Tobias J. was not entitled to an education.

92.　　Again, under Conn. Gen. Stat. § 10-233d(g), Tobias J. was entitled to an additional hearing should Hartford Public Schools choose to adopt the Bloomfield Public

20

Schools' expulsion hearing decision. Tobias J. and Robert J. never received notice of any such hearing and no such hearing is documented in Tobias J.'s educational record. Upon information and belief, Hartford Public Schools automatically adopted Bloomfield Public Schools' expulsion decision.

93.     During the next few weeks, Robert J. did not hear from the Milner principal nor any other Hartford Public School staff about Tobias J.'s education. Hartford Public Schools denied Tobias J. all access to education.

94.     In December 2014, Robert J. attempted to contact the Milner principal to follow up on Tobias J.'s status, but he could not reach her. He did speak to the Milner vice principal. The Milner vice principal told Robert J. that the principal had not heard back from her supervisor yet and that the principal would give him a call. Robert J. never heard back from the principal.

95.     At the beginning of 2015, after the full term of Tobias J.'s expulsion had expired, Tobias J. and Robert J. began receiving community-based social work services from Thelma Gilbert ("Ms. Gilbert"), a staff person at the nonprofit agency Village for Families and Children. Ms. Gilbert attempted to help Robert J. get Tobias J. enrolled in school. She contacted various Hartford Public Schools departments to help Tobias J., but received no response and Tobias J. remained excluded from education.

96.     Tobias J. continued to receive no education well into the 2015 calendar year, long after his expulsion should have expired. In addition to *de facto* accepting Tobias J.'s expulsion and excluding him from education without a proper hearing, Hartford Public Schools also *de facto* extended Tobias J.'s expulsion beyond its term of 180 school days, which was the maximum length permissible under Connecticut law.

97.     On or about February 12, 2015, Robert J. returned to the HBOE Welcome Center to ask again about Tobias J.'s enrollment. Welcome Center staff then told him that Milner staff should have enrolled Tobias J. by now and that it was not clear why Milner had not done so. Welcome Center staff encouraged Robert J. to return to Milner so that the enrollment process could be finalized for Tobias J. and Tobias J. could start school. However, even knowing that Milner staff had failed to properly enroll Tobias J. previously, the Welcome Center staff did not offer to do anything to help ensure his enrollment.

98.     After talking to the Welcome Center staff in February 2015, Robert J. and Tobias J. returned to Milner to attempt to complete the enrollment process so that Tobias J. could start school. They spoke with both the Milner vice principal and principal. Robert J. and Tobias J. received no explanation about why no one from the school had contacted them about Tobias J.'s enrollment. By this time, Tobias J.'s expulsion period had been over for approximately two months. Nonetheless, the Milner principal told Robert J. that Tobias J. must undergo a risk assessment through the non-profit agency Wheeler Clinic before he could be "cleared" to attend Milner School. The Milner principal told Robert J. that her supervisor at the HBOE Central Office had told her that this risk assessment had to be done.

99.     Robert J. complied with this requirement and allowed the school to schedule an appointment with Wheeler Clinic for an evaluation. A social worker at Milner coordinated and set up this appointment.

100.    On or about March 6, 2015, Wheeler Clinic staff met Tobias J. at Milner for a brief risk assessment. Rather than advise the school staff of its findings

immediately while they were on site at the school, Wheeler Clinic staff told Robert J. that they would need to complete a written report and they would contact Robert J. upon the completion of the report.

101.     On or about March 13, 2015, Wheeler staff contacted Robert J. to tell him that the assessment report was ready.  Wheeler staff told Robert J. that he would need to personally pick up the assessment report at their office in Plainville, Connecticut. Robert J. immediately went to pick up the report, which indicated there was no reason that Tobias J. should not return to school.

102.     That same day, Robert J. brought the assessment report to Milner and delivered it to the Milner secretary.  The Milner secretary told him that someone would contact him with Tobias J.'s start date for school.

103.     On April 24, 2015, Robert J. was contacted by Milner staff to have Tobias J. start school.  He was told that there was additional paperwork that needed to be filled out and that upon completion Tobias J. could start eighth grade classes.  Robert J. immediately complied with this request, taking Tobias J. and the paperwork that he had previously filled out back to Milner.  Milner staff told Tobias J. that he could either start that day by going to his in-progress second period class or, because April 24 was a Friday, he could return and start on the following Monday.  Robert J. and Tobias J. decided that it would be better for him to start a fresh week on Monday rather than joining all of his classes in the middle of the day.

104.     On April 27, 2015, Tobias J. started the eighth grade at Milner.  After he started at Milner, his teachers all gave him the option of either trying to make up all of the work that he had missed or just being graded based on his work until the end of the

year.  Tobias J. decided to try to complete the work that he had missed.  Hartford Public Schools provided him no remedial instruction or any type of tutoring or additional instruction to compensate for all the educational time they had denied him.  He was promoted to the ninth grade at the end of the 2014-2015 school year.

105.    Tobias J. wanted to attend a magnet school during the 2015-2016 school year.  He applied for the magnet school lottery, but he was not accepted through the lottery process.  Consequently, in August 2015, Robert J. registered Tobias J. for the ninth grade at the HBOE Welcome Center for the 2015-2016 school year at Bulkeley Lower School.

106.    During Tobias J.'s period of expulsion and exclusion from educational opportunities, he was in a hostile educational environment.  Tobias J. received a substandard education in the form of minimal tutoring from the end of January 2014 until the start of April 2014.  He received no education whatsoever after the start of April 2014 until late April 2015.  Tobias J. received no education until late April 2015 even though his expulsion ended on December 16, 2014.  Hartford Public Schools actively obstructed Tobias J. from enrolling in school.

107.    As a result of the hostile educational environment, Tobias J. suffered great harm.  Tobias J. lost his seat at the Global Experience Magnet School and was unable to attend a magnet school for the 2014-2015 and 2015-2016 school years.  He also was forced to repeat his eighth grade year.

108.    The hostile educational environment made Tobias J. increasingly hopeless, despondent, and angry.  He spent a lot of time thinking about his future and worrying about what would happen because he was not receiving an education.  He knew

that he would have no opportunities for postsecondary education or employment without an education. He felt like he could not do anything to access education, and he knew that he could not do anything fulfilling in his life without an education. Tobias J. felt himself becoming increasingly angry during this denial of education. He noticed that he could get mad over the smallest things during that time and this got worse the longer he was excluded. One of the reasons Tobias J. and Robert J. had to get counseling was because Tobias J. had so much anger about his situation.

109.    Robert J. noticed that the denial of education changed how Tobias J. acted because he became withdrawn and would stay to himself. The hostile educational environment Tobias J. suffered also caused Robert J. significant stress when he would think about his son's future and the lack of education that he received. He also was sometimes late to work due to trying to get Tobias J. enrolled in school, and this made Robert J. worried about how his employer would view him.

**B.     THE STATE DEFENDANTS HAVE SIGNIFICANTLY HARMED EXPELLED STUDENTS THROUGH THEIR PROVISION OF SUBSTANDARD EDUCATION IN VIOLATION OF THE CONSTITUTION**

   **i.      The State Defendants Consistently Fail to Ensure that all Connecticut Students Have Access to Suitable Public Education**

110.    The State Defendants have taken no action to ensure that students who are expelled receive adequate alternative educational opportunities.

111.    The provision of insufficient alternative educational opportunities to expelled children contributes to their falling behind their peers, receiving significantly less content and instruction, and inhibiting their progress towards the upper grades, and ultimately high school graduation and the chance for independent, meaningful participation in our democratic society.

112.     According to data collected by SDE, approximately 1,000 children are expelled from Connecticut schools each year.  Upon information and belief, over 40 percent of expelled students receive "homebound tutoring," "homework only" or no education during their expulsion period.  Nearly two-thirds of school districts that expel students use tutoring as the alternative educational opportunity provided to some expelled students.  Roughly one-third of districts that expel students only offer expelled students tutoring as their alternative educational opportunity.  Nearly one-third of all districts that expel students use "homework only" as an alternative educational opportunity for some expelled students.

113.     Upon information and belief, the State Defendants have created no criteria for the administration of alternative educational programs for expelled students and provide no monitoring or oversight to these programs.

114.     Upon information and belief, the State Defendants have created no criteria for the administration of homebound tutoring programs for expelled students and provide no monitoring or oversight to these programs.  Instead, the State Defendants have exempted homebound tutoring programs from the strict credit hour requirements that apply to regular classroom work at the high school level.  Expelled children receive substantially less education than their non-expelled peers in terms of hours of instruction; course offerings; and access to instructional technology:

     a.     Each school year, Connecticut students are entitled to receive 180 school days of education providing a minimum of 900 hours.  Expelled students, such as Plaintiffs Alicia B. and Tobias J., receive a fraction of these hours of educational services;

26

b.      Connecticut students are entitled to receive an education that

includes a variety of course offerings by certified teachers, academic and non-

academic, inclusive of, but not limited to career education; consumer education;

health and safety.  Additionally, the education that students receive must meet a

minimum qualitative standard that allows them to become responsible citizens

who move on to productive employment or higher education.  Expelled students,

such as Plaintiffs Alicia B. and Tobias J., receive limited course offerings and

limited access to certified subject-area teachers.

115.      Upon information and belief, the State Defendants are aware that

Connecticut expelled students receive inferior access to education compared than their

peers in nearby states such as Massachusetts, New Jersey, and Pennsylvania.  For

example, in both Massachusetts and New Jersey, expelled students are entitled to an

individual education plan that ensures their progress and success.  In New Jersey and

Pennsylvania, expelled students are placed in programs that are accredited by the state

and/or local board and provide mandated access to counseling and behavioral

interventions.

116.      Despite their obligation to ensure a meaningful education for all of

Connecticut's children, their knowledge of the lack of access that expelled students have

to meaningful education in Connecticut, and their knowledge of models from other states

that improve expelled students' access to education, upon information and belief, the

State Defendants have failed to take reasonable steps to ensure that expelled students

have access to adequate education.

117.     Upon information and belief, the State Defendants have failed to encourage the passage of legislation or the promulgation of regulations that would set standards, guidelines, and requirements for the alternative educational opportunities provided to expelled students.

118.     During the 2013 Legislative Session, the State Defendants had the opportunity to support improving the education received by expelled students by amending Conn. Gen. Stat. § 10-233d through House Bill 6504, An Act Concerning Alternative School Programs.  However, the State Defendants did not support this language in the legislation, and the bill that ultimately passed into law did not mention education provided to expelled students.

119.     Under Public Act 13-122, Defendants SDE and Wentzell were responsible for conducting a study of alternative schools and programs.  Defendants SDE and Wentzell were further responsible for making recommendations for guidance, oversight, and requirements to improve the quality of education provided by alternative schools and programs.  However, the study released in February 2014 did not address the alternative educational opportunities provided to expelled students, nor did it make any recommendations for improving educational services provided to students during expulsions.

120.     During the 2014 Legislative Session, Raised Bill no. 5567, An Act Concerning Alternative Schools was raised.  This bill specifically included language to ensure that minimum standards would be established for the alternative education provided to expelled students.  This language was expressly removed from the bill that was approved by the Education Committee.  The State Defendants did not protest this

change and took no action to ensure that such language be preserved for the benefit of expelled students.

121.    During the 2015 Legislative Session, although two bills were introduced to address the inadequacy of alternative education provided to expelled students, H.B. 6615 and H.B. 6531, upon information and belief, the State Defendants again did not advocate for the passage of these bills.  Neither bill made it out of the Education Committee.

122.    In fact, the State Defendants took no action to support bills that would have addressed the lack of clarity and minimum standards for alternative education opportunities provided to expelled students.  Instead, the Alternative Schools bill that passed into law as Public Act 15-133 did not encompass the alternative education opportunities to be provided to expelled students pursuant to Conn. Gen. Stat.§ 10-233d.

123.    Upon information and belief, the State Defendants have taken no other steps to ensure that expelled students receive meaningful education.

124.    Upon information and belief, the State Defendants have provided no guidance to school districts as to how the expulsion process should be handled for students in magnet, choice, or charter schools.  Under Conn. Gen. Stat. § 10-233d, students are entitled to a hearing before a board of education accepts the expulsion decision of another school district.  However, upon information and belief, the State Defendants have provided no guidance to school districts about conducting these hearings; provided no oversight to ensure that school districts are conducting these hearings; and provided no guidance about which school district is responsible for providing access to alternative education upon expulsion from a magnet, choice, or

29

charter school.  Furthermore, upon information and belief, the State Defendants have

provided no guidance about a students' ability to return to a magnet, choice, or charter

school upon the conclusion of an expulsion.

> ii.    The State Defendants Have Refused to Address the Hostile Education
> Environment Experienced by Black Children While Expelled

125.    Upon information and belief, the State Defendants know that Black

children in Connecticut are much more likely to experience the harm of insufficient

education during expulsion.  Annual data collected from school districts by Defendant

SDE and reviewed at Defendant State Board meetings repeatedly shows that Black

children in Connecticut are disproportionately expelled, and therefore, disproportionately

placed in hostile educational environments that stunt learning.

126.    For example, data from the 2011-2012 school year demonstrate that

Black students in the State of Connecticut were expelled at almost four times the rate of

their White peers.  In comparison to all other students in the State of Connecticut, Black

students were almost three times as likely to be expelled.

2011-2012 Statewide Data Comparing Enrollment by Race with Expulsions by Race

|  | **Black** | **Hispanic** | **White** | **Other** |
|---|---|---|---|---|
| **Total Enrollment** | 13% | 19.5% | 60.75% | 6.75% |
| **Expulsions** | 30.5% | 26.75% | 37.25% | 5.5% |

127.    Additionally, data from the 2012-2013 school year demonstrate that

Black students in the State of Connecticut were expelled at almost eight times the rate of

their White peers.  In comparison to all other students in the State of Connecticut, Black

students were almost six times as likely to be expelled.  Upon information and belief, a

change in reporting practices for enrollment figures may have impacted these rates.

However, even absent the change in reporting practices, there is no reason to believe that the rates would be significantly different than the year before or the year after.

2012-2013 Statewide Data Comparing Enrollment by Race with Expulsions by Race

|  | Black | Hispanic | White | Other |
|---|---|---|---|---|
| Total Enrollment | 7.75% | 20% | 59.5% | 12.75% |
| Expulsions | 33% | 29% | 32% | 6% |

128.     Again, data from 2013-2014 also showed a disproportionate number of Black students being expelled.  Black students were expelled at almost four times the rate of their White peers.  In comparison to all other students in the State of Connecticut, Black students were almost three times as likely to be expelled.  Although Black children comprised approximately 13 percent of total public school student enrollment, they represented more than 30 percent of the total number of students expelled from public schools statewide.

2013-2014 Statewide Data Comparing Enrollment by Race with Expulsions by Race

|  | Black | Hispanic | White | Other |
|---|---|---|---|---|
| Total Enrollment | 13% | 21 % | 58.5% | 7.5 % |
| Expulsions | 30.75% | 30% | 35% | 4.25% |

129.     Yet again, data from the recent 2014-2015 school year showed that Black students were expelled at almost four times the rate of their White peers.  In comparison to all other students in the State of Connecticut, Black students were almost three times as likely to be expelled.

2014-2015 Statewide Data Comparing Enrollment by Race with Expulsions by Race

|  | Black | Hispanic | White | Other |
|---|---|---|---|---|
| Total Enrollment | 13% | 22% | 57.25% | 7.75% |
| Expulsions | 31% | 28% | 35.5% | 5.5% |

130.     Upon information and belief, statewide, White students are more likely than Black students to be expelled for offenses where referral for expulsion is mandated by statute, offenses including drugs or weapons.  Upon information and belief, Black students, like Alicia B. and Tobias J., are more likely than White students to be expelled for offenses where referral for expulsion is discretionary.  Upon information and belief, this disparity results from selective enforcement of facially neutral disciplinary policies.

131.     This intentional discrimination results in Black students being placed in alternative educational environments where they cannot obtain the benefits of public education.  In other words, the selective enforcement creates a hostile educational environment for Black students who are expelled.  Upon information and belief, the State Defendants were aware of this hostile educational environment but failed to take adequate remedial measures.

132.     On June 5, 2013 and March 4, 2015, at meetings of Defendant State Board, employees of Defendant SDE presented data showing that Connecticut Black children were more frequently expelled than White children and, consequently, more frequently experienced the harm of a hostile educational environment while expelled. Defendant Taylor attended both these meetings.

133.     On March 11, 2015, over 35 percent of testimony submitted on Raised Bill 1053, An Act Prohibiting Out-of-School Suspensions and Expulsions For Students in Preschool and Grades Kindergarten To Two, to the Connecticut Legislature described how Connecticut students of color are excluded from school more than White students.

134.     Upon information and belief, despite receiving and reviewing these disproportionate figures year after year, the State Defendants have taken no action to correct this problem.  For example:

a.     As part of Defendant SDE's presentation to Defendant State Board on June 5, 2013 which described the significant disparities experienced by Connecticut Black children in exclusion from education, Defendant State Board also presented a list of "Actions to Turn the Curve."  None of the actions described by Defendant SDE explicitly included efforts to reduce racial disparities in access to adequate education for regular education students;

b.     Connecticut created the Alliance District program to provide additional funding to low-performing districts.  To receive this funding, Alliance Districts must submit a reform plan for approval to Defendant Wentzell. Defendant SDE reviews Alliance District plans on an annual basis and states that it bases annual plan approval on district implementation and performance during the prior year.  Defendants HBOE, MBOE, and BBOE are all Alliance Districts.  In the same presentation to Defendant State Board on June 5, 2013, Defendant SDE claimed that it would require Alliance Districts with identified climate and behavioral issues to address those issues in their Alliance District applications.  None of the subsequent Alliance District applications from Defendants HBOE, MBOE, or BBOE mention any direct efforts to reduce racial disparities in expulsions.

C.     HARTFORD DEFENDANTS PROVIDE SUBSTANDARD ALTERNATIVE EDUCATIONAL OPPORTUNITIES TO STUDENTS DURING EXPULSION.

135.     Hartford Defendants regularly and consistently place expelled students in substandard alternative educational opportunities, including the New Visions program. The alternative educational opportunities that Hartford Defendants offer to expelled students do not provide more than twelve-and-a-half hours of education a week to expelled students.

136.     Although expelled students placed in New Visions are supposed to receive work from their home school, it is often weeks or months before students receive any work from their home school.  Regardless of the source of the work, Hartford Public Schools' model for education for expelled students involves limited-to-no direct instruction during students' independent work on packets of worksheets.

137.     The inadequacy of the alternative education provided to expelled students has been brought to the attention of Hartford Public Schools several times since at least 2013, and HBOE has continued to offer these students substandard education.

138.     Expelled students in Hartford Public Schools miss crucial instruction and classroom discussion that is essential for progression from one grade to the next. They are also denied the same opportunity to earn the requisite credits needed to make meaningful progress towards graduation.  Moreover, they do not have access to physical education, health, art, and many electives required for graduation.

139.     Moreover, Hartford Defendants do not provide these expelled students with the ability to access a guidance counselor, vocational planning or training, any related services staff or personnel, or to the technology and resources available to students in their regular school setting.  For students placed in New Visions, like Alicia B., the communication between New Visions and the students' home school is at best

34

sporadic, making students' return to their home schools all the more difficult.  Upon
information and belief, students placed at New Visions do not receive progress reports or
report cards, making their transition back to their home schools more challenging.

140.     Black students in Hartford continue to suffer this deprivation of
education at higher rates than children of other races.

141.     Data from the 2011-2012 school year demonstrate that Hartford Black
children were expelled at overwhelming rates compared to all other children.  Black
students were expelled at over fourteen times the rate of their White peers.  In
comparison to all other students in Hartford Public Schools, Black students were almost
twice as likely to be expelled.

2011-2012 Hartford Data Comparing Enrollment by Race with Expulsions by Race

|                  | Black  | Hispanic | White  | Other  |
|------------------|--------|----------|--------|--------|
| Total Enrollment | 33%    | 49.75%   | 9.75%  | 7.5%   |
| Expulsions       | 48.75% | 48.75%   | 0%     | 2.5%   |

142.     Additionally, data from the 2012-2013 school year demonstrate that
Black students in Hartford Public Schools were expelled at almost three times the rate of
their White peers.  In comparison to all other students in Hartford Public Schools, Black
students were over one-and-a-half times as likely to be expelled.

2012-2013 Hartford Data Comparing Enrollment by Race with Expulsions by Race

|                  | Black | Hispanic | White         | Other         |
|------------------|-------|----------|---------------|---------------|
| Total Enrollment | 32%   | 50%      | 11%           | 7%            |
| Expulsions       | 42%   | 48.75%   | Less than 5%  | Less than 5%  |

143.     Similarly, data from the 2013-2014 school year demonstrate that Black
students in Hartford Public Schools were expelled at over two-and-a-half times the rate of

their White peers. In comparison to all other students in Hartford Public Schools, Black students were almost two times as likely to be expelled. Although they made up less than one-third of the total Hartford Public Schools student population, Black children were nearly half of the students who were expelled during the course of the 2013-2014 school year.

2013-2014 Hartford Data Comparing Enrollment by Race with Expulsions by Race

|  | Black | Hispanic | White | Other |
|---|---|---|---|---|
| **Total Enrollment** | 31.25% | 49.5% | 12.35% | 7% |
| **Expulsions** | 47 % | 41.5% | 7 % | 4.5% |

144.    In the 2014-2015 school year, Black students in Hartford Public Schools were expelled at over four times the rate of their White peers. In comparison to all other students in Hartford Public Schools, Black students were almost two-and-a-half times as likely to be expelled.

2014-2015 Hartford Data Comparing Enrollment by Race with Expulsions by Race

|  | Black | Hispanic | White | Other |
|---|---|---|---|---|
| **Total Enrollment** | 30.75% | 55.25% | 12.5% | 6.5% |
| **Expulsions** | 53% | 40.5% | Less than 5% | Less than 5% |

145.    Upon information and belief, these disparities are the result of the selective enforcement of facially neutral disciplinary policies. This intentional discrimination results in Hartford Black students being placed in alternative educational environments where they cannot obtain the benefits of public education. In other words, the selective enforcement creates a hostile educational environment for Hartford Black students who are expelled. Upon information and belief, the Hartford Defendants were aware of this hostile educational environment but failed to take adequate remedial measures.

D.     MANCHESTER DEFENDANTS PROVIDE SUBSTANDARD
ALTERNATIVE EDUCATIONAL OPPORTUNITIES TO STUDENTS DURING
EXPULSION

146.     Upon information and belief, Manchester Defendants place expelled

students in substandard alternative educational opportunities.  Manchester Defendants

provide some students, such as Tobias J., with tutoring as their alternative educational

opportunity while expelled, which does not provide more than ten hours of education a

week.

147.     Upon information and belief, expelled students in Manchester Public

Schools who receive tutoring as their alternative educational opportunity miss crucial

instruction and classroom discussion that is essential for progression from one grade to

the next.  They are also denied the same opportunity to earn the requisite credits needed

to make meaningful progress towards graduation.  Moreover, they do not have access to

many of the courses required for graduation.

148.     Upon information and belief, Black students in Manchester suffer this

deprivation of education at higher rates than White children.

149.     Data from the 2011-2012 school year demonstrate that Black children

were expelled at overwhelming rates compared to all other children.  Black students in

Manchester Public Schools were expelled at four times the rate of their White peers.  In

comparison to all other students in Manchester Public Schools, Black students were

almost two-and-a-half times as likely to be expelled.

2011-2012 Manchester Data Comparing Enrollment by Race with Expulsions by Race

|  | **Black** | **Hispanic** | **White** | **Other** |
|---|---|---|---|---|
| **Total Enrollment** | 21.3% | 23.6% | 42.6% | 12.4% |
| **Expulsions** | 40% | 40% | 20% | 0% |

150.     Upon information and belief, in Manchester Public Schools, White students are more likely than Black students to be expelled for offenses where referral for expulsion is mandated by statute, offenses including drugs or weapons.  Upon information and belief, Black students in Manchester Public Schools are more likely to be expelled for offenses where Manchester Public Schools exercises discretion in referral for expulsion.

151.     Upon information and belief, these disparities are the result of the selective enforcement of facially neutral disciplinary policies.  This intentional discrimination results in Manchester Black students being placed in alternative educational environments where they cannot obtain the benefits of public education.  In other words, the selective enforcement creates a hostile educational environment for Manchester Black students who are expelled.  Upon information and belief, the Manchester Defendants were aware of this hostile educational environment but failed to take adequate remedial measures.

E.     BLOOMFIELD DEFENDANTS RELEGATE STUDENTS EXPELLED FROM THEIR MAGNET SCHOOLS TO SUBSTANDARD ALTERNATIVE EDUCATIONAL OPPORTUNITIES.

152.     Upon information and belief, Bloomfield Defendants regularly and consistently place expelled students in substandard alternative educational opportunities. For example, in the 2012-2013 school year, Bloomfield Defendants provided "homework only" to 73 percent of expelled students and "tutoring" to 27 percent of expelled students in their district.

153.     Expelled students in Bloomfield Public Schools miss crucial instruction and classroom discussion that is essential for progression from one grade to the next.

They are also denied the same opportunity to earn the requisite credits needed to make meaningful progress towards graduation.  Moreover, they do not have access to many of the courses required for graduation.

154.     Upon information and belief, Bloomfield defendants have no policies or practices for providing alternative educational opportunities to students expelled from Bloomfield magnet schools, such as Tobias J.

155.     Black students in Bloomfield suffer this deprivation of education at higher rates than children of other races.

156.     Data from the 2011-2012 school year demonstrate that Black children were expelled at overwhelming rates compared to all other children.  Black students in Bloomfield Public Schools were expelled at over twelve times the rate of their White peers.  In comparison to all other students in Bloomfield Public Schools, Black students were over eleven times as likely to be expelled.

2011-2012 Bloomfield Data Comparing Enrollment by Race with Expulsions by Race

|  | Black | Hispanic | White | Other |
|---|---|---|---|---|
| Total Enrollment | 74.5% | 9.0% | 9.5% | 6.8% |
| Expulsions | 100% | 0% | 0% | 0% |

157.     Upon information and belief, these disparities are the result of the selective enforcement of facially neutral disciplinary policies.  This intentional discrimination results in Bloomfield Black students being placed in alternative educational environments where they cannot obtain the benefits of public education.  In other words, the selective enforcement creates a hostile educational environment for Bloomfield Black students who are expelled.  Upon information and belief, the

Bloomfield Defendants were aware of this hostile educational environment but failed to take adequate remedial measures.

## III. LEGAL CLAIMS

### Count One: Against all Defendants (Connecticut Constitution, Article Eighth, § 1)

158.    Paragraphs 1 through 157 are incorporated herein.

159.    Under the Constitution of Connecticut, Article Eighth, § 1, the State Defendants are responsible for ensuring that all students attending public school receive an education suitable to give them the opportunity to be responsible citizens able to participate fully in democratic institutions and to prepare them to progress to institutions of higher education or to attain productive employment. The State Defendants are further responsible for ensuring that students in Connecticut receive substantially equal educational opportunities.

160.    Under Conn. Gen. Stat. §§ 10-15c, and 10-220, the State Defendants have established a statutory scheme making the Hartford, Manchester, and Bloomfield Defendants responsible for direct provision of that education to students in their respective school districts.

161.    This Constitutional obligation, implemented by the statutory scheme and shared by all Defendants, is an obligation that extends to all students, even those who are expelled.

162.    The State Defendants have failed to ensure the Plaintiffs' access to an education that meets constitutional requirements.

163.    The Hartford, Manchester, and Bloomfield Defendants have failed to provide the Plaintiffs with an education that meets these constitutional requirements.

164.     As a result of these constitutional violations, the Plaintiffs have suffered irreparable harm, including, but not limited to the deprivation of their fundamental right to an adequate education, for which there is no adequate remedy at law.

Count Two: Against All Defendants (Connecticut Constitution, Article Eighth, § 1 and Article First, §§ 1 and 20)

165.     Paragraphs 1 through 164 are incorporated herein.

166.     In accordance with Article First, §§ 1 and 20, the Equal Protection Clauses of the Connecticut Constitution, the State, Hartford, Manchester, and Bloomfield Defendants are prohibited from denying any individual the equal enjoyment of any right to which that individual is entitled on account of race, color, ancestry, or national origin.

167.     The Defendants have demonstrated a pattern of discrimination by selectively enforcing facially neutral expulsion policies, which constitutes a violation of the protections guaranteed by the Constitution.  This selective enforcement has resulted in Black students being subject to inadequate education at disproportionate rates throughout the state.  The Defendants cannot articulate a nondiscriminatory reason for the widespread selective enforcement.

168.     In addition, the inadequate educational opportunities for expelled students create a hostile educational environment for Black expelled students.  The Defendants have actual knowledge of these hostile educational environments that deny expelled Black students access to education.  The Defendants have failed to take adequate remedial measures.  The Defendants were therefore deliberately indifferent to discrimination that created a hostile educational environment for Black expelled students.

41

169.     As a result, the Plaintiffs have suffered irreparable harm, including, but not limited to the deprivation of their fundamental right to an adequate education, for which there is no adequate remedy at law.

Count Three: Against All Defendants (Violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983)

170.     Paragraphs 1 through 169 are incorporated herein.

171.     Under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, no state or state actors may deny any person within the state the equal protection of the laws.

172.     The Defendants have demonstrated a pattern of discrimination by selectively enforcing facially neutral expulsion policies, which constitutes a violation of the protections guaranteed by the United States Constitution. This selective enforcement has resulted in Black students being subject to inadequate education at disproportionate rates throughout the state. The Defendants cannot articulate a nondiscriminatory reason for the widespread selective enforcement.

173.     In addition, the inadequate educational opportunities for expelled students create a hostile educational environment for Black expelled students. The Defendants have actual knowledge of these hostile educational environments that deny expelled Black students access to education. The Defendants have failed to take adequate remedial measures. The Defendants were therefore deliberately indifferent to discrimination that created a hostile educational environment for Black expelled students.

174.     The acts complained of were committed by the Defendants who were at all times acting under color of state law to deprive the Plaintiffs of their federal right to equal protection within the meaning of 42 U.S.C. § 1983.

42

175.    As a result, the Plaintiffs have suffered irreparable harm, for which there is no adequate remedy at law.

Count Four: Against State Department Of Education, State Board Of Education, Hartford Board Of Education, Manchester Board Of Education, and Bloomfield Board Of Education (Title VI and 42 U.S.C. § 1983)

176.    Paragraphs 1 through 175 are incorporated herein.

177.    In accordance with Title VI of the Civil Rights Act, as amended and found at 42 U.S.C. §2000d *et seq.*, Defendants State Department Of Education, State Board Of Education, Hartford Board Of Education, Manchester Board Of Education and Bloomfield Board Of Education, as recipients of federal assistance, are prohibited from discriminating against any individual in their administration of any programs or activities on account of race, color or national origin.

178.    Upon information and belief, each Defendant above is a recipient of federal funding.

179.    The Defendants have demonstrated a pattern of discrimination by selectively enforcing facially neutral expulsion policies, which constitutes a violation of the protections guaranteed by Title VI of the Civil Rights Act. This selective enforcement has resulted in Black students being subject to inadequate education at disproportionate rates throughout the state. The Defendants cannot articulate a nondiscriminatory reason for the widespread selective enforcement.

180.    In addition, the inadequate educational opportunities for expelled students create a hostile educational environment for Black expelled students. The Defendants have actual knowledge of these hostile educational environments that deny expelled Black students access to education. The Defendants have failed to take adequate

remedial measures.  The Defendants were therefore deliberately indifferent to discrimination that created a hostile educational environment for Black expelled students.

181.    The acts complained of were committed by the Defendants who were at all times acting under color of state law to deprive the Plaintiffs of their federal right to nondiscrimination within the meaning of 42 U.S.C. § 1983.

182.    As a result, the Plaintiffs have suffered irreparable harm, for which there is no adequate remedy at law.

## RELIEF REQUESTED:

183.    Wherefore, Plaintiffs respectfully request that:

    i.    The Court declare that the Plaintiffs have a Constitutional right to a suitable educational opportunity, and that all Defendants have violated the Plaintiffs' right to an education under the Connecticut Constitution;

    ii.    The Court declare that all Defendants violated the Equal Protection Clauses of the Connecticut Constitution;

    iii.    The Court declare that all Defendants violated the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution;

    iv.    The Court declare that State Department Of Education, State Board Of Education, Hartford Board Of Education, Manchester Board Of Education, and Bloomfield Board Of Education violated Title VI of the Civil Rights Act of 1964;

    v.    The Court declare that tutoring, homework and provision of worksheets as alternative educational opportunities to students during expulsion is insufficient and unconstitutional;

    vi.    The Court grant an immediate and permanent injunction against all Defendants, preventing the provision of insufficient and inadequate alternative educational opportunities to the Plaintiffs and similarly situated students;

    vii.    The Court grant an immediate injunction against all Defendants, preventing the expulsion of any student until such time that Defendants can guarantee expelled students' constitutional right to education;

viii.   The Court order State Defendants to immediately establish specific guidance to all school districts in the state for the administration of alternative educational opportunities to expelled students, guidance that includes the development of individual learning plans through assessment of individual students' needs and other strategies to ensure expelled students' constitutional right to education;

ix.   The Court order Hartford, Manchester, and Bloomfield Defendants, in conjunction with State Defendants' oversight, immediately to develop and maintain new alternative forms of education for expelled students that will provide suitable educational opportunities to the Plaintiffs and uphold their constitutional rights, encompassing a minimum of 25 hours of education weekly;

x.   The Court order the State Defendants to develop and oversee a corrective action plan for Hartford, Manchester, and Bloomfield Defendants to eradicate their discriminatory expulsion practices and also order the State to identify other offending school districts and subject them to such guidance and corrective action;

xi.   The Court order all Defendants, in collaboration with one another, immediately to provide Plaintiffs Tobias J. and Alicia B. with compensatory education, in accordance with the recommendations of an education expert of the Plaintiffs' choice, for the months of education missed and substandard education received;

xii.    The Court order all Defendants, in collaboration with one another, immediately to provide all expelled children with compensatory education;

xiii.    The Court render an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

xiv.    The Court order any such other and further relief as the Court may deem just and proper.


THE PLAINTIFFS

By: _____

Marisa M. Halm, Esq.
Martha Stone, Esq.
Center for Children's Advocacy
65 Elizabeth Street
Hartford, CT 06105
(860) 570-5327
(860) 570-5256 fax
mhalm@kidscounsel.org
Juris No.: 421708

Hannah Benton Eidsath, Esq.
National Center for Youth Law
405 14th Street, 15th Floor
Oakland, CA 94612
(510) 835-8098
(510) 835-8099 Fax
hbenton@youthlaw.org
Juris No.: 428982

Walter P. Loughlin, Esq.
K&L Gates, LLP
599 Lexington Avenue
New York, New York 10022
(212) 536-4065
(212) 536-3901
Walter.Loughlin@klgates.com
Juris No.: 372525

ON THE COMPLAINT:
Michael Harris
Annie Lee
National Center for Youth Law

Priya Chadha
Erica Iverson
Luke Steinberger
K&L Gates, LLP